UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> SAMUEL BANKMAN-FRIED, FTX TRADING LTD D/B/A FTX.COM, ALAMEDA RESEARCH LLC, CAROLINE ELLISON, AND ZIXIAO "GARY" WANG, <br><br> Defendants. | Case No. 1:22-cv-10503-PKC <br><br> **CONSENT ORDER FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST DEFENDANTS FTX TRADING LTD. d/b/a FTX.COM AND ALAMEDA RESEARCH LLC** |

## I.    INTRODUCTION

On December 21, 2022, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed an Amended Complaint for Injunctive and Other Equitable Relief and for Civil Monetary Penalties Under the Commodity Exchange Act and Commission Regulations ("Amended Complaint," ECF No. 13) against Defendants Samuel Bankman-Fried ("Bankman-Fried"), FTX Trading Ltd. d/b/a FTX.com ("FTX Trading"), Alameda Research LLC ("Alameda"), Caroline Ellison ("Ellison") and Zixiao "Gary" Wang ("Wang") (collectively, "Defendants"), for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26, and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2022).[1]

---

[1] On December 23, 2022, the Court entered consent orders of judgment on liability against Defendants Wang and Ellison. ECF Nos. 25 and 26. In a related case, the Court entered a consent order of judgment as to liability and partial injunctive relief against former FTX executive Nishad Singh. *CFTC v. Singh*, Case No. 23-CV-1684 (S.D.N.Y. April 13, 2023), ECF No. 17. These orders impose permanent injunctive relief but reserve the issues of monetary relief or further remedies under Section 6c of the Act, 7 U.S.C. § 13a-1 for determination by the Court separately upon motion of the Commission or by a proposed consent order.

## II.    CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Amended Complaint against Defendants FTX Trading and Alameda (together referred to as the "FTX Entity Defendants") without a trial on the merits or any further judicial proceedings, the FTX Entity Defendants:

1.      Consent to the entry of this Consent Order for Permanent Injunction and Other Equitable Relief Against the FTX Entity Defendants ("Consent Order");

2.      Affirm that they have read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the CFTC or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

3.      Acknowledge service of the summons and Amended Complaint;

4.      Admit the jurisdiction of this Court over them and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

5.      Admit the jurisdiction of the CFTC over the conduct and transactions at issue in this action pursuant to the Act;

6.      Admit that venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e);

7.      Acknowledge that on November 11, 2022, they initiated Chapter 11 bankruptcy proceedings pending in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) ("FTX Bankruptcy Proceeding");

8.      Waive:

> (a) Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the

Regulations, 17 C.F.R. pt. 148 (2023), relating to, or arising from, this action;

(b) Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

(c) Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

(d) Any and all rights of appeal from this Consent Order;

9.    Acknowledge that the Commission is the prevailing party in this action for purposes of the waiver of any and all rights under the Equal Access to Justice Act specified in subpart (a) of Paragraph 8;

10.    Subject to the provisions in paragraph 77 below, consent to the continued jurisdiction of this Court over them for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if the FTX Entity Defendants now or in the future reside outside the jurisdiction of this Court;

11.    Agree that they will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and waive any objection based thereon;

12.    Stipulate that for purposes of exceptions to discharge under 11 U.S.C. § 1141(d)(6) (excepting from discharge debts of a kind specified in 11 U.S.C. § 523(a)(2)(A) or (2)(B)), that the findings of fact in this Consent Order are true and admitted by the FTX Entity Defendants, and that the monetary component of the judgment in this Consent Order for restitution is a debt for violation by the FTX Entity Defendants of federal commodities laws;

13.     Consent to the use of the Findings of Fact and Conclusions of Law in this Consent Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, and agree that they shall be taken as true and correct and be given preclusive effect therein, without further proof; provided, however, that nothing in this Consent Order shall affect the FTX Entity Defendants' (a) testimonial obligations, or (b) right to take legal or factual positions in litigation or other proceedings to which the Commission is not party;

14.     Do not consent, however, to the use of this Consent Order, or the Findings of Fact and Conclusions of Law herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party, other than a:  proceeding in bankruptcy, or receivership; or proceeding to enforce the terms of this Order; and

15.     Subject to the provisions in paragraph 77 below, agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitably remedy against the FTX Entity Defendants in any other proceeding.

## III.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.  The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.  The findings and conclusions in this Consent Order are not binding on any other party to this action.

**THE PARTIES AGREE AND THE COURT FINDS:**

**A. Findings of Fact**

16.      Plaintiff CFTC is an independent federal regulatory agency charged by Congress with administering and enforcing the Act and the Regulations.

17.      FTX Trading is a corporation organized in Antigua and Barbuda.  FTX Trading, along with various subsidiaries and affiliate entities, including, without limitation, FTX Digital Markets Ltd., collectively did business as "FTX.com" or "FTX," and operated a digital asset derivatives trading exchange beginning no later than May 2019 and continuing through at least November 11, 2022 ("Relevant Period").[2]  FTX Trading has never been registered with the Commission in any capacity.  FTX Trading is currently a debtor in the FTX Bankruptcy Proceeding.

18.      Alameda is a Delaware limited liability company.  During the Relevant Period, Alameda, along with various subsidiaries and affiliate entities, did business as "Alameda," and operated as a digital asset trading and investment firm.  Alameda has never been registered with the Commission in any capacity.  Alameda is currently a debtor in the FTX Bankruptcy Proceeding.

19.      Alameda was founded by Bankman-Fried in November 2017 and initially operated from Berkeley, California.  Alameda maintained an office in the United States at times, and certain Alameda employees were based in or performed work from the United States. Bankman-Fried had a 90% ownership interest in Alameda.

20.      By late 2018, Bankman-Fried and others employed at Alameda had begun building the centralized digital asset derivatives exchange that would ultimately become FTX

---

[2] This order uses "FTX" to refer to the group of entities that collectively did business as FTX.com.

Trading.  Certain FTX Trading employees, including key personnel, were based in or performed work from the United States, including in this District.  FTX Trading regularly engaged in advertising and promotional activities in the United States.  Bankman-Fried was the ultimate owner of the majority of the shares of FTX Trading.

21.    Bankman-Fried regularly signed core corporate agreements for the FTX Entity Defendants.  Bankman-Fried was also a signatory on bank accounts for the FTX Entity Defendants, and an authorized person on Alameda trading accounts.  The FTX Entity Defendants held certain bank and trading accounts at banks and trading firms in the United States.

22.    The FTX Entity Defendants co-mingled assets deposited by customers with other corporate assets; failed to properly document intercompany transfers of assets; and regularly shared employees, office space, systems, accounts and communications channels.  Assets were regularly transferred between the FTX Entity Defendants, often without documentation or effective tracking.

23.    Bankman-Fried was CEO of Alameda until August 2021, at which time he appointed Ellison and another individual as co-CEOs to replace him.

24.    Even after August 2021, Bankman-Fried remained a signatory on Alameda's bank accounts and an authorized trader for Alameda's accounts with CFTC-registered futures commission merchants.  Bankman-Fried also maintained direct decision-making authority over all of Alameda's major trading, investment, and financial decisions.

25.    Alameda acted as "market maker" and "liquidity provider" in certain digital asset markets, including markets on FTX after its launch.  Alameda also made large equity investments in various companies in the digital asset industry.  These activities were often

facilitated by large loans Alameda obtained from digital asset lending platforms and other sources.

26.     In April 2019, the FTX.com website was launched and trading on the FTX platform was made available to the public.  FTX offered trading in many digital assets, including digital asset commodities such as bitcoin (BTC), ether (ETH), tether (USDT), and others.  FTX operated primarily as a derivatives exchange and offered trading in various options, futures, swaps, "perpetual futures" and other digital asset commodity derivative products.

27.     FTX allowed customers to place buy (long) and sell (short) orders in an electronic order book and matched customer orders via its "trading engine" or "matching engine."  FTX also offered many additional services related to the trading of digital asset products.  For example, FTX operated a peer-to-peer margin lending program where customers could offer margined and leveraged offerings to one another.

28.     Customers could access the FTX trading platform through the FTX.com website, through a mobile application, and through an Application Programming Interface (API).  FTX also offered an off-exchange "over the counter" (OTC) portal that enabled customers to connect and request quotes for spot digital assets and trade directly with Alameda, rather than using the FTX central limit order book.

29.     In marketing materials and in communications with federal regulators, including the CFTC, and others, FTX touted its auto-liquidation risk management engine, cross-margin functionality and backstop liquidity provider ("BLP") programs as unique features that limited risk.  Alameda was a leading participant in the BLP program.

30.     FTX relied on Alameda resources, assets and personnel to carry out many core functions for the FTX platform, including creating liquid submarkets for products offered on

FTX, maintaining a balance of various digital assets on the exchange and supporting the peer-to-peer margin lending program.  Alameda likewise relied on various FTX resources, assets and personnel.

31.    When Bankman-Fried and others launched the FTX trading platform in 2019, FTX did not establish bank accounts to accept and hold customer deposits.  Instead, customers seeking to deposit "fiat" currency (i.e., traditional government-issued currency) into their FTX accounts were directed to wire their fiat deposits to bank accounts that were owned and controlled by Alameda.  Some of those bank accounts were opened in the name of an entity called North Dimension, Inc., a Delaware-registered wholly owned subsidiary of Alameda. Certain of these bank accounts were held with banks located in and/or based in the United States.

32.    Once received, assets deposited by FTX customers often were not segregated from Alameda assets.  When FTX customers deposited assets into Alameda bank accounts, FTX personnel generally credited FTX customer accounts with the corresponding amount of fiat currency on an internal ledger system.  Customers accessing their FTX accounts could observe on the exchange's website (and later mobile application) that their deposits had been posted to their FTX accounts, even though the fiat deposits often remained in Alameda bank accounts.

33.    Alameda personnel also had the ability to access FTX digital assets, including digital assets deposited by customers and held in FTX digital asset "hot" (online) wallets, via the withdrawal capabilities of its FTX account.  Alameda's role in this process and the corresponding access granted to Alameda was not disclosed to FTX customers.

34.    The Alameda-owned bank accounts holding fiat assets deposited by FTX customers were collectively reflected on FTX's internal ledger systems as the "fiat@ftx"

account.  This internal account reflected a balance of as much as $11 billion in assets at certain times before the collapse of FTX in November 2022.

35.    Although FTX had opened its own FBO (for the benefit of customers) fiat bank accounts in 2020, some deposits from FTX customers continued to be received in Alameda bank accounts even after 2020.

36.    From the launch of FTX, Alameda accessed and used assets deposited by FTX customers for Alameda's operations and activities, including to fund certain Alameda trading, investment and borrowing/lending activities.  Alameda's use of assets deposited by FTX customers included both fiat deposits that were sent to Alameda bank accounts and digital asset deposits and holdings that Alameda accessed via the essentially unbounded withdrawal capabilities of its FTX account.

37.    Alameda's use of FTX exchange assets deposited by FTX customers was not authorized by FTX customers, and FTX customers were not made aware that these assets were being used by Alameda.  To the contrary, FTX's Terms of Service expressly prohibited such use of exchange assets.  Section 8.2.6 of the FTX Trading Terms of Service stated:

All Digital Assets are held in your Account on the following basis:

(A)    Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B)    None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C)    You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

38.     Bankman-Fried and other representatives of FTX publicly stated that assets

deposited by customers were properly segregated and custodied by FTX.  For example, during

February 9, 2022 testimony before the United States Senate Committee on Agriculture, Nutrition

and Forestry, Bankman-Fried, while advocating for the implementation of legislation regarding

digital assets and the extension of certain legal protections to digital asset exchanges, testified as

follows about FTX's treatment of customer deposits:

> FTX has policies and procedures for its platforms today that reflect this
> basic principle by maintaining liquid assets for customers withdrawals,
> including a sufficient balance of digital assets funded by the company for
> its non-U.S. platform. The resources are funded to provide sufficient cover
> against user losses under certain events and extreme scenarios in order to,
> among other purposes, ensure a customer without losses can redeem its
> assets from the platform on demand.
> […]
> In keeping with this principle, FTX provides a user experience that enables
> any user to easily view account balances for all assets, for all of its
> platforms, in real time. By logging in to the customer's account at FTX, the
> customer can immediately view the types of assets they own held in custody
> by FTX. The assets are ledgered and easily identifiable to the user (but held
> in an omnibus wallet in the case of the customer's tokens in order to better
> promote liquidity on the platform) pursuant to internal policies and
> procedures, and FTX regularly reconciles customers' trading balances
> against cash and digital assets held by FTX. Additionally, as a general
> principle FTX segregates customer assets from its own assets across our
> platforms.

39.     Contrary to such representations and without disclosure to FTX customers, the

FTX Entity Defendants commingled assets and freely used assets deposited by FTX customers

as if they were Alameda's assets, including as capital to deploy in Alameda's own trading and

investment activities.

40.     Commingled FTX assets, including assets deposited by FTX customers, were also

used by Bankman-Fried and FTX for extensive marketing and promotional expenses in the

United States, including a Super Bowl commercial and the sponsorship of a sports stadium in

Miami, Florida.  Many of these advertisements, including the Super Bowl commercial, touted "FTX" as "the safest and easiest way to buy and sell crypto."  Some of these promotional activities were paid for by FTX.

41.    Throughout the Relevant Period, Alameda's account on FTX had a special designation in the FTX code, labeled an "Allow Negative" flag, which allowed Alameda to withdraw an unlimited amount of digital assets from the FTX.com exchange while having a net-negative account balance, and exempted Alameda's account from the automatic liquidation process.  In addition, Alameda's borrowing limit was set to $65 billion.  Taken together, Alameda's $65 billion borrowing limit and the Allow Negative  privilege gave Alameda the unique ability to borrow and withdraw digital assets directly from FTX.

42.    Alameda's ability to withdraw virtually unlimited assets from FTX was not publicly disclosed until December 2022.

43.    During the Relevant Period, Alameda used large amounts of capital, including some misappropriated assets, to acquire equity holdings in a variety of digital asset companies and relatively illiquid digital assets.  One of Alameda's most significant holdings was the FTX Token ("FTT") digital asset.  FTT was the FTX "exchange token" and was used, among other things, to obtain discounted trading fees for transactions on FTX.

44.    Alameda's FTT holdings represented a significant portion of its balance sheet, and also represented a significant portion of all FTT in circulation during the Relevant Period.  Alameda generally valued its FTT holdings on its balance sheet at the market price at which FTT was traded, without applying an appropriate discount to reflect that it could not have sold its significant FTT holdings into the marketplace without causing a sharp reduction in its trading price.

45.    Alameda also held extremely large quantities of several other illiquid digital assets relative to their circulation volumes, and likewise did not apply appropriate discounts to the values of those holdings on its balance sheet.

46.    Alameda relied on its significant holdings of FTT and similar illiquid tokens, valued at the market value of the asset without appropriate discounts, as collateral to support several large loans from various digital asset lending platforms.  During the Relevant Period, Alameda took out many loans, at times totaling more than $10 billion in notional value.

47.    By early 2022, Alameda had invested several billion dollars in directional, unhedged, illiquid and/or long-term investments.  To fund these investment activities, Alameda relied on billions of dollars of loans from digital asset lending platforms, traditional bank lines of credit and its unlimited borrowing abilities on FTX, including its access to assets that had been deposited by FTX customers.

48.    During the spring of 2022, the digital asset markets as a whole experienced a significant downturn.  This downturn came to a head in May 2022 with the crash of two significant and widely traded digital assets, whose value was essentially reduced to zero.

49.    During May and June of 2022, Alameda was subject to a number of margin calls and loans that were called.  Alameda did not have enough liquid assets to meet these obligations. Instead, Alameda increased its usage of assets deposited by customers to meet its external debt obligations.  Alameda relied on its undisclosed ordinary-course access to these assets through its FTX account to facilitate these large withdrawals, which were several billion dollars in notional value.

50.    By about mid-2022, FTX's internal ledgers reflected that the balance of Alameda's USD fiat liability to FTX totaled approximately $8 billion.

51.     During this time, public statements made by Bankman-Fried and other FTX and Alameda executives falsely portrayed that FTX and Alameda remained highly profitable and liquid.

52.     Following the market crash of May 2022, Bankman-Fried, through Alameda and other entities, bailed out several digital asset companies with loans or acquisitions, funded in part or in whole by assets that had been deposited by FTX customers.

53.     At Bankman-Fried's direction, FTX executives concealed Alameda's approximately $8 billion in USD fiat liabilities by reallocating them to a customer account on FTX's systems that Bankman-Fried would later refer to as "our Korean friend's account" and "the weird Korean account."  This account was initially opened as a sub-account of Alameda's main FTX account, but was later reassigned to be associated with another account that was not otherwise readily identifiable as being an Alameda-associated account.  The system notes associated with the account described it as "ftx-fiat-old."  As a result, it was no longer apparent on FTX's ledgers that Alameda had an $8 billion USD fiat negative balance on its FTX account.

54.     The same type of "Allow Negative" flag and exemption from liquidation characteristics that applied to the Alameda accounts also applied to the so-called "weird Korean account."

55.     On November 2, 2022, the online digital asset news publication Coindesk.com published an article titled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet," and subtitled: "Alameda had $14.6 billion of assets as of June 30, according to a private document CoinDesk reviewed. Much of it is the FTT token issued by FTX, another Bankman-Fried company."  This article reported on a purported leaked

Alameda balance sheet that showed that, at least as of June 30, 2022, an extremely high portion of Alameda's $14.6 billion in assets consisted of FTT.

56.    At the same time, many FTX customers began requesting to withdraw assets from the exchange.

57.    By late in the day on November 7, 2022, FTX lacked sufficient assets to cover all incoming customer withdrawal requests, and there were not sufficient assets held in various FTX accounts to cover all customer obligations.

58.    Bankman-Fried, Ellison, and other key personnel of the FTX Entity Defendants acknowledged internally that this shortfall was not merely a matter of having sufficient liquid assets on hand to cover customer withdrawals in the short term; rather, funds and digital assets deposited by customers were not available because those funds and digital assets had been misappropriated.

59.    During this same period, Alameda traders were directed by Bankman-Fried and Ellison to sell everything that could be sold quickly from Alameda's holdings, to maximize open lines of credit or any other available sources of capital, and generally do anything possible to quickly obtain billions of dollars in assets to send to FTX to satisfy customer withdrawal requests.

60.    In public statements and various Twitter messages, Bankman-Fried and others acting on behalf of FTX continued to portray the shortfall as a liquidity problem.  Bankman-Fried falsely stated that FTX continued to be solvent and that all customer deposits were safe.

61.    While Bankman-Fried was making these public assurances, he and others acting on behalf of FTX were also reaching out to as many sources of funding as possible in an attempt

to quickly raise several billion dollars to cover the shortfall in assets owed to others. Numerous parties declined to bail out FTX regardless of the favorable terms being offered.

62.     At about this same time, Bankman-Fried and others prepared or caused to be prepared a balance sheet to be shared with prospective investors showing the assets and liabilities of the companies. That balance sheet was unorthodox in several respects. Most notably, the balance sheet included an $8 billion negative balance attributed to a "hidden, poorly internally labeled 'fiat@' account."

63.     On the morning of November 9, 2022 around 10 AM ET, Ellison, in her capacity as Alameda's CEO, held an "all-hands" meeting with Alameda staff. In that meeting, Ellison acknowledged that earlier that year, she, Bankman-Fried and other individuals had decided to use assets deposited by FTX customers to pay Alameda's debts, and that certain other senior FTX executives were aware of this. In that meeting, Ellison stated that "starting last year" Alameda had been "borrowing a bunch of money by open term loans" and used those assets to "make very illiquid investments." Ellison added that following the widespread decline of digital asset prices, most of Alameda's loans had been called, and that to meet those calls, Alameda had borrowed "a bunch of funds" from FTX, which in turn "led to FTX having a shortfall in user funds." Ellison informed Alameda staff that FTX had "always allowed" Alameda to borrow assets deposited by customers, and did not require collateral for those loans. She also explained that Alameda could access assets deposited by FTX customers without requiring FTX's approval as the "structure" of the FTX exchange allowed Alameda to "go negative in coins." Shortly after this meeting, most of Alameda's staff resigned.

64.     On November 8, 2022, FTX halted withdrawals, and Bankman-Fried announced on November 10 that Alameda was being wound down.  Bankman-Fried also posted a lengthy Twitter thread purporting to explain how he "f[***]ed up."

65.     On November 11, 2022, at about 4:30 am ET, Bankman-Fried signed a document resigning his position as CEO of FTX and, as majority owner of all the FTX and Alameda companies, authorizing the appointment of an independent CEO with plenary authority to file for Chapter 11 bankruptcy proceedings.

66.     On November 11 and 14, 2022, 102 separate companies affiliated with FTX, including the FTX Entity Defendants, commenced the FTX Bankruptcy Proceeding.

67.     In his "first day" declaration submitted shortly after the filing of the FTX Bankruptcy Proceeding, the new and independent FTX CEO said the following of the situation:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.
>
> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.

## B.  Conclusions of Law

68.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency

expressly authorized to sue by Act of Congress).  Section 6c of the Act, 7 U.S.C. § 13a-1, which

provides that whenever it shall appear to the CFTC that any person has engaged, is engaging, or

is about to engage in any act or practice constituting a violation of any provision of the Act or

any rule, regulation, or order promulgated thereunder, the CFTC may bring an action in the

proper district court of the United States against such person to enjoin such act or practice, or to

enforce compliance with the Act, or any rule, regulation or order thereunder.

69.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C.

§ 13a-1(e), because acts and practices in violation of the Act occurred within this District.

70.      By the conduct described above and in the Amended Complaint, the FTX Entity

Defendants, acting together as a common enterprise, violated Section 6(c)(1) of the Act, 7 U.S.C.

§ 9(1), and Regulation 180.1(a) (1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2023), by intentionally

or recklessly, in connection with swaps and contracts of sale of commodities in interstate

commerce, employing a scheme or artifice to defraud; and engaging in acts, practices, and a

course of business that operated as a fraud or deceit on FTX customers, digital asset lenders to

Alameda, and other market participants.  The acts, omissions, and failures of Bankman-Fried,

Ellison, and other officers, employees or agents acting for the FTX Entity Defendants were done

within the scope of their office, employment or agency and therefore, pursuant to 7 U.S.C. §

2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), the FTX Entity Defendants are liable for each violation of

Section 6(c)(1) of the Act and Regulation 180.1(a)(1), (3) they committed.

71.      By the conduct described above and in the Amended Complaint, the FTX Entity

Defendants, acting together as a common enterprise, violated Section 6(c)(1) of the Act, 7 U.S.C.

§ 9(1), and Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2023), by intentionally or recklessly,

in connection with swaps and contracts of sale of commodities in interstate commerce, making

untrue or misleading statements of material fact, and omitting to state material facts necessary to make the statements made not untrue or misleading. The acts, omissions, and failures of Bankman-Fried, Ellison, and other officers, employees or agents acting for the FTX Entity Defendants were done within the scope of their office, employment or agency and therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), the FTX Entity Defendants are liable for each violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(2) they committed.

72.     Unless restrained and enjoined by this Court, there is a reasonable likelihood that the FTX Entity Defendants will continue to engage in the acts and practices alleged in the Amended Complaint and in similar acts and practices in violation of the Act and Regulations.

## IV.    PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

73.     Based upon and in connection with the foregoing conduct described in the Findings of Fact and Conclusions of Law, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the FTX Entity Defendants, and any of their affiliates, agents, servants, employees, successors, assigns, attorneys and persons in active concert or participation with them, are permanently restrained, enjoined and prohibited from directly or indirectly:

a.     Cheating or defrauding, or attempting to cheat or defraud, willfully deceiving or attempting to deceive, customers or other persons by, among other things, intentionally or recklessly, in connection with any swap, or contract of sale or any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, directly or indirectly:

    i.   using or employing, or attempted to use or employ, a scheme or artifice to defraud in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1), 17 C.F.R. § 180.1(a)(1) (2023);

    ii.   making untrue or misleading statements of material fact, or omitting to state material facts necessary to make the statements made not untrue or misleading in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(2), 17 C.F.R. § 180.1(a)(2) (2023); and

    iii.   engaging or attempting to engage in acts, practices, or a course of business that operates or would operate as a fraud or deceit on any person, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(3), 17 C.F.R. § 180.1(a)(3) (2023).

74.    With the exception of any transactions associated with the operation or winding up of any of the debtors in the FTX Bankruptcy Proceeding under the supervision of, or as authorized by, the Bankruptcy Court, the FTX Entity Defendants, and any of their affiliates, agents, servants, employees, successors, assigns, attorneys and persons in active concert or participation with them, are also permanently restrained, enjoined and prohibited from directly or indirectly:

    a.   Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40);

    b.   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2023)) or digital asset commodities, including but not limited to bitcoin (BTC), ether (ETH), or tether (USDT), for their own account or for any account in which they have a direct or indirect interest;

c.  Having any commodity interests or digital asset commodities, including but not limited to bitcoin (BTC), ether (ETH), or tether (USDT), traded on their behalf;

d.  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital asset commodities, including but not limited to bitcoin (BTC), ether (ETH), or tether (USDT);

e.  Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or digital asset commodities, including but not limited to bitcoin (BTC), ether (ETH), or  tether (USDT);

f.  Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2023); and/or

g.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2023)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

## V.    RESTITUTION AND DISGORGEMENT

75.    Subject to the provisions of paragraph 77 below, **FTX Trading and Alameda** shall pay, jointly and severally, restitution of Eight Billion Seven Hundred Million Dollars ($8,700,000,000) ("Restitution Obligation") to persons who sustained losses proximately caused

by the violations of the Act and Regulations described in the Amended Complaint and this

Consent Order.

76.     Subject to the provisions of paragraph 77 below, FTX Trading and Alameda shall

pay, jointly and severally, disgorgement of Four Billion Dollars ($4,000,000,000)

("Disgorgement Obligation") for gains received in connection with the violations described in

the Amended Complaint and this Consent Order.

77.     The Restitution Obligation and Disgorgement Obligation shall be deemed

satisfied as follows:

   a.  In recognition of the FTX Bankruptcy Proceeding and the distributions to be

       made by the FTX Entity Defendants and their affiliated debtor entities in

       connection therewith, pursuant to the mutual agreement of the Commission and

       the FTX Entity Defendants, the Restitution Obligation and Disgorgement

       Obligation shall be credited or payable as provided in the Claim Settlement and

       Subordination Agreement between the CFTC and the FTX Entity Defendants

       filed in the Bankruptcy Proceeding and approved by the Bankruptcy Court (the

       "Settlement Agreement") and the "Eligible Plan" referenced therein.  The

       Commission and the FTX Entity Defendants may agree to amend or modify the

       Settlement Agreement at any time without further order of this Court;

   b.  Pursuant to the Eligible Plan, distributions of the funds or assets in the FTX

       Bankruptcy Proceeding in satisfaction of the Restitution Obligation and

       Disgorgement Obligation will be managed by either the Chief Executive Officer

       of FTX Trading or the Plan Administrator approved by the Bankruptcy Court in

       the FTX Bankruptcy Proceeding;

c.  The CEO of the FTX Entity Defendants or Plan Administrator shall provide the Commission at the conclusion of each quarter of each calendar year a report detailing the disbursement of funds or assets in satisfaction of the Restitution Obligation and Disgorgement Obligation.  The CEO of the FTX Entity Defendants or Plan Administrator shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581; with a copy to Robert T. Howell, Deputy Director, Commodity Futures Trading Commission, Ralph Metcalfe Federal Building, 77 West Jackson Blvd., Ste. 800, Chicago, IL 60604;

d.  Within ten days of the final disbursement in the FTX Bankruptcy Proceeding, the FTX Trading CEO or Plan Administrator shall, under a cover letter that identifies the name and docket number of this proceeding, transmit to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and Robert T. Howell, Deputy Director, Commodity Futures Trading Commission, Ralph Metcalfe Federal Building, 77 West Jackson Blvd., Ste. 800, Chicago, IL 60604, a certification of the final amount of distributions made in satisfaction of the Restitution Obligation and Disgorgement Obligation;

e.  The FTX Entity Defendants shall receive a dollar-for-dollar credit against the Restitution Obligation for any amounts distributed under the Eligible Plan in the Bankruptcy Proceeding in satisfaction of FTX.com and FTX.US customer claims, and Alameda lender claims;

    f.   The FTX Entity Defendants shall receive a dollar-for-dollar credit against the Disgorgement Obligation for any amounts distributed towards the CFTC's allowed claim for disgorgement in the Bankruptcy Proceeding;

    g.   If the Eligible Plan is fully effectuated and administered, the Restitution Obligation and Disgorgement Obligation shall be deemed satisfied;

    h.   If the Eligible Plan is not fully effectuated or administered, or the FTX Bankruptcy Proceeding is converted to another bankruptcy chapter or is dismissed, any amounts of the Restitution Obligation and Disgorgement Obligation remaining shall be due and payable and the CFTC reserves the right to assert that these amounts are excepted from discharge under 11 U.S.C. 523(a)(2).

78.    The amounts paid or payable to any persons in connection with this Consent Order shall not limit the ability of any person from proving that a greater amount is owed from Defendants in this case or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any person that exist under state or common law.

79.    To the extent that any funds accrue to the U.S. Treasury for satisfaction of the Restitution Obligation or Disgorgement Obligation, such funds shall be transferred to the Plan Administrator for disbursement in accordance with the procedures set forth above.

## VI.    MISCELLANEOUS PROVISIONS

80.    The FTX Entity Defendants shall cooperate fully and truthfully with the CFTC, including the CFTC's Division of Enforcement, in this action, and in any other litigation, proceeding, or investigation involving possible violations of the Act or Commission Regulations by any entity or individual related in any way to the FTX Entity Defendants, including any current or future investigations or litigation related to, or arising from, this action.

81.     As part of such cooperation, the FTX Entity Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys and persons in active concert or participation with the FTX Entity Defendants, shall comply, to the full extent of their abilities, promptly and truthfully with any inquiries or requests for information including but not limited to, requests for production of documents and authentication of documents, and shall provide assistance at any trial, proceeding, or investigation related to the subject matter of this action, including but not limited to, requests for testimony, depositions, and/or interviews.  In any actions related to the subject matter of this action, representatives of the FTX Entity Defendants, or of their affiliates, agents, servants, employees, successors, assigns, attorneys and persons in active concert or participation with the FTX Entity Defendants, are directed to appear in the judicial district in which such action is pending, or in a suitable judicial district agreed to by the parties, to provide deposition testimony and trial testimony should such testimony be necessary.

82.     Entire Agreement and Amendments:  This Consent Order and the Settlement Agreement, together, incorporate all of the terms and conditions of the settlement between the CFTC and the FTX Entity Defendants to date.  Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless:  (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

83.     Invalidation:  If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

84.     Waiver:  The failure of any party to this Consent Order or of any person at any time to require performance of any provision of this Consent Order shall in no manner affect the

right of the party or person at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

85.     Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action in order to implement and carry out the terms of this Consent Order, to entertain any suitable application or motion for additional relief within the jurisdiction of the Court, to assure compliance with this Consent Order and for all other purposes relevant to this action, including any motion by the FTX Entity Defendants, or their successors or assigns, to modify or for relief from the terms of this Consent Order.

86.     Authority:  John J. Ray III hereby warrants that he is Chief Executive Officer of the FTX Entity Defendants, and that this Consent Order has been duly authorized by the FTX Entity Defendants, and he has been duly empowered to sign and submit this Consent Order on behalf of the FTX Entity Defendants.

87.     Counterparts and Facsimile Execution:  This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

88.     The FTX Entity Defendants' consent to the entry of the Consent Order does not constitute a waiver by the FTX Entity Defendants of the automatic stay with respect to any further action by the CFTC.

89.     The FTX Entity Defendants understand that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings they may not challenge the validity of this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this *Consent Order of Permanent Injunction and Other Equitable Relief Against Defendants FTX Trading Ltd. d/b/a ftx.com and Alameda Research LLC* without further notice.

**IT IS SO ORDERED** on this 7th day of August, 2024.

_____
P. Kevin Castel
United States District Judge

**CONSENTED TO AND APPROVED BY:**

FTX TRADING LTD. and ALAMEDA RESEARCH LLC

John Ray, CEO of the FTX Entity Defendants

Dated: 7/12/24

**Approved as to Form:**

James McDonald
(mcdonaldj@sullcrom.com)
Sullivan & Cromwell LLP
125 Broad St.,
New York, New York 10004
(212) 558-3030
(212) 558-1600 (fax)

One of the Attorneys for the FTX Entity Defendants

PLAINTIFF COMMODITY FUTURES TRADING COMMISSION

**Carlin Metzger, Senior Trial Attorney**
Commodity Futures Trading Commission

Dated: 8/5/2024

Nina Ruvinsky (nruvinsky@cftc.gov)
Carlin Metzger (cmetzger@cftc.gov)
Elizabeth N. Pendleton
(ependleton@cftc.gov)
Robert T. Howell (rhowell@cftc.gov)

Ralph Metcalfe Federal Office Building
77 W. Jackson, Suite 800
Chicago, Illinois 60604
(312) 596-0700
(312) 596-0714 (fax)

28